UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHIRLEY OSTASZEWSKI,

                 Plaintiff,                Case No. 15-cv-12313

v.                                   District Judge Gerald Rosen

                                     Magistrate Judge Anthony P. Patti

SCOTT ZELENOCKS, *et al.*,

                 Defendants.

_____/

**REPORT AND RECOMMENDATION REGARDING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (DE 27)**

**I.**     **RECOMMENDATION**:  The Court should **GRANT** Defendants' Motion

for Summary Judgment.  (DE 27.)

**II.**     **REPORT**

       **A.  Background**

       Plaintiff filed this action in June 2015 against Scott Zelenocks

("Defendant"), a police officer for the City of Warren, Michigan ("the City"), and

the City itself.  (DE 1.)  Plaintiff asserts constitutional and state law claims arising

from a November 7, 2013 incident when Plaintiff called the police regarding a

domestic disturbance at her daughter's home.  Defendant was one of the two

officers who was dispatched in response to Plaintiff's call.

### 1.      Plaintiff's Account of the Incident

Plaintiff has two children, Rhiannon and Steven Mertens.  (Plaintiff's Dep. at 8.)[1]  On the date at issue, Plaintiff was asked to come to Rhiannon's house because Steven's fiancée, Rachel (with whom Steven has two children), Rachel's mother, Regina, and Regina's girlfriend, Kim, were "sitting out front" of Rhiannon's house in a car.  (*Id.* at 16-17.)  Rachel, Regina and Kim had been to Rhiannon's house earlier that day "trying to get Steven and Rachel's ordeal worked out . . . ."  (*Id.*)

When Plaintiff arrived, Rhiannon, Steven and Plaintiff's six grandchildren were inside.  (*Id.* at 18.)  Soon thereafter, Regina and Kim came to the front door.  (*Id.* at 18-19.)  Without being invited in, Regina "pushed her way in and ran up the stairs[,]" which is where Plaintiff's grandchildren were located.  (*Id.* at 20.)  Kim then also entered.  (*Id.*)

Rhiannon also went upstairs, followed by Plaintiff.  (*Id.* at 20-21.)  When Plaintiff arrived upstairs, Rhiannon and Regina were engaged in a physical altercation, so Plaintiff called 911.  (*Id.* at 21.)  Regina and Kim then went outside, but they stayed by their car, which was parked near Rhiannon's house.  (*Id.* at 22-23.)  About five minutes later, two police officers arrived.  (*Id.* at 24.)  When the

---

[1] Relevant portions of Plaintiff's deposition transcript are attached to the opposing parties' briefs as DE 27-3, 29-2 and 31-2.

officers arrived, Regina was outside, yelling.  (*Id.* at 55.)  Plaintiff was unsure if

Steven was also yelling from inside.  (*Id.* at 56.)

What happened immediately after Defendant arrived at Rhiannon's home is

the heart of this case.  According to Plaintiff:

> When they [the police officers] pulled up, I didn't want my daughter
> to go outside because Regina was out there, so I told them I would go
> out and meet with the officer. I went out the door. I walked down her
> stairs and I walked across the grass because they were over here, so I
> figured I'd stay this way. It was a decent distance. And I stood there.
> He [Defendant] pulled his car in. He got out. And he was walking up
> and I said "Hello, sir," to him, and the next thing I knew is he grabbed
> up my arm way real high up in the air, telling me to "Shut the fuck
> up." He's dragging me down to the stairs. I said "Sir, you're hurting
> me." He's telling me to "Shut the fuck up."
>
> Q. What stairs?
>
> A. My daughter's stairs.
>
> Q. Inside or outside?
>
> A. Outside. He got me down to the stairs. My husband opened the
> screen door, asked him "What are you doing to my wife?" as I'm
> holding my hand up to my husband to stay in the house. He said to my
> husband, "Don't you know I can arrest every fucking one of youse?"
> [sic] And I'm just looking at this officer, like "Really? You're talking
> like this? You're hurting me. For what?"
>
> Q. Did you say anything to him?
>
> A. I told him he was hurting me.
>
> Q. Anything else?

> A. Then he finally lowered my arm. And Regina was still yelling. And
> he had asked if we could go in the house and talk, and I said "Yes, we
> could have talked back there." That's what I said to him.

(*Id.* at 25-26.)[2]

Plaintiff stated she then went into the bathroom to examine her hurting arm
and when she left the bathroom she saw the other responding officer (i.e., not
Defendant) inside the house talking to Rhiannon. (*Id.* at 27.) Plaintiff had no
further physical contact with either officer after coming inside, and the only
additional verbal contact she had with the police was asking the second officer to
identify the officer who had grabbed her arm. (*Id.* at 30-31.)

Several hours later, Plaintiff went to the emergency room, where she was
given a shot for pain and told she had a strained shoulder. (*Id.* at 32-33.)[3] Records
from the St. John Macomb Hospital show that an x-ray of Plaintiff's left shoulder
was negative for a fracture. (DE 29-3 at 15.) Plaintiff saw her regular doctor
shortly thereafter and he prescribed pain medication and physical therapy;

---

[2] In her deposition, Rhiannon Mertens stated that she did not see the encounter
between her mother and Defendant but "heard the police officer say that he was
going to arrest everybody-fucking-body in the house . . . ." (Rhiannon Mertens
Dep., DE 27-6 at 5.) Plaintiff's husband, Michael Ostaszewski, averred at his
deposition that he saw Plaintiff being dragged by the arm by a police officer.
(Michael Ostaszewski Dep., DE 27-5 at 5.) When Michael asked what the officer
was doing, he responded "'Shut the fuck up.' And then his next response was, 'I'll
arrest every-fucking-body.'" (*Id.* at 6.)

[3] Plaintiff was not sure if she was told she had a strained shoulder at the emergency
room or when she saw her physician soon thereafter. (*Id.* at 33.)

4

however, Plaintiff ceased going to physical therapy after a visit or two due to losing her health insurance.  (Plaintiff's Dep. at 34.)

Plaintiff never spoke with anyone from the City about the incident.  (*Id.* at 48.)  Plaintiff was asked if she knew "of any custom in the City of Warren or policy that you believe led to the violation of your civil rights per your complaint[,]" to which she responded "[n]o. I'm new to Warren, so I'm -- I don't know what all their stuff is in Warren."  (*Id.* at 51.)[4]

## 2.  Defendant's Account of the Incident

Defendant stated that he had no contact with Plaintiff either before or after the November 7, 2013 incident underlying this action.  (Zelenocks Dep. at 22.)[5] As for the November 7 incident, Defendant stated that his shift had begun about an

---

[4] Although it does not affect the outcome of the motion, the Court notes that Plaintiff's response to Defendants' motion for summary judgment states that she was forty-eight years old at the time of the incident in question, and at least twice refers to her as weighing sixty-five pounds.  (DE 29 at 7-8, 13.)  Plaintiff stresses her allegedly diminutive stature, asserting that she "is a smallish, older woman entirely incapable of jeopardizing the Defendant's safety."  (*Id.* at 14.)  However, as Defendants accurately state in their reply brief, Plaintiff's medical records show that she weighed sixty-five *kilograms*, not sixty-five *pounds*.  (*See, e.g.,* DE 29-3 at 7, 8.)  Sixty-five kilograms equals slightly over 143 pounds. https://www.conversion-metric.org/weight/kilogram-to-pound (last visited November 17, 2016).  This is a big swing. Plaintiff bases a significant portion of her argument on this inaccurate portrayal of her stature, urging the Court to believe that she posed no immediate threat to the officers, citing *Smoak v. Hall*, 460 F.3d 768, 783 (6th Cir. 2006) (DE 29 at 13.)

[5] DE 27-4 at 4.

5

hour before he, along with his partner, Officer Betcher, was dispatched to

Rhiannon's house.  (*Id.* at 23.)  Defendant could not remember what he observed

when he first arrived at the house.  (*Id.* at 24-25.)

> The following colloquy then occurred:
>
> Q When you arrived at the Rivard address [i.e., Rhiannon's home],
> what did you do next?
>
> A We went into the house.
>
> Q You went into the house with Officer Betcher?
>
> A Yes.
>
> Q At the same time?
>
> A Yes.
>
> Q Before you walked into the house was there anybody standing
> outside?
>
> A I don't recall. [6]
>
> Q And did you walk right into the house or did you knock?
>
> MR. MORRIS [Defendant's attorney]: Object to form.
>
> THE WITNESS: I don't recall. Sometimes people meet us at the door.
> Sometimes we have to knock on the door. I know that we heard
> arguing inside the house because there was [sic] multiple people in
> there.

---

[6] Later, Defendant did not completely foreclose the possibility that there could have
been someone outside when he arrived—he could not recall definitively.  (*Id.* at
33.)

BY MR. ZAMBORSKY [Plaintiff's attorney]: Q Was the arguing yelling?

A Yes.

Q But you don't recall how you get into the Rivard house?

A No, sir, I don't.

Q Do you recall [if] both you and officer Betcher were inside the house?

A Yes, we were.

Q Did any other officers appear on scene?

A I don't believe so.

Q And when you were inside the house did you talk to anybody?

A Multiple people.

Q Do you recall how many people you talked to?

A I think eight or nine total.

Q Do you recall any of those conversations?

A Verbatim, no.

Q Generally, do you recall any of those conversations?

A Yes. There was arguing between two people in the house, and it was combative and assaultive in nature.

(*Id.* at 26-27.)

Defendant was later asked if he had "any physical contact with anybody" while at Rhiannon's house, to which he responded "[p]eople that we separated in

7

the living room." (*Id.* at 37.)  Shortly thereafter, he said he had separated people

"[b]ecause they were combative with each other, yelling at each other, and other

verbal commands didn't do it so we had to separate them.  Kind of like little kids in

a room. You go to the chair. You can go to the couch kind of thing." (*Id.*).

Defendant could not remember how many people with whom he had physical

contact.  (*Id.*)

At a later point Defendant was asked "[o]n November 7, 2013, while you

were at the Rivard address, were you using force on any individuals there?[,]" to

which he simply responded "[n]o." (*Id.* at 42-43.)  Defendant also did not observe

Betcher using force on anyone.  (*Id.* at 43.)  However, the following testimony was

provided:

> Q Did you have physical contact with anyone?
>
> A Be more specific on the question.
>
> Q When you first arrived there and you walked into the house, there were a group of individuals arguing, correct?
>
> A Yes.
>
> Q And you had to separate those individuals, correct?
>
> A Yes.
>
> Q Did you have to physically separate any of those individuals?
>
> A Yes.
>
> Q How did you physically separate them?

8

> A Stepping between them, pointing directions, may have physically put my hand on somebody's shoulder or arm because it was getting to the point where it was going to be extremely physical so very well may have touched somebody's arm or shoulder telling them to go to the other side of the room and act like adults.
>
> Q Did you grab anybody?
>
> A Not that I recall, no. . . .
>
> Q Do you recall what room you were in?
>
> A I believe it was right there in the living room. I think that the first room as you walk in the front door.

(*Id.* at 43-44.)

When subsequently asked if he recalled the demeanor the adults displayed when he arrived at the scene, Defendant stated "[a]ggressive, combative. I mean, they were yelling and screaming at each other and we were telling them to knock it off and they didn't listen so we had to separate them." (*Id.* at 46.) Defendant's deposition conclude with Defendant denying having grabbed Plaintiff:

> Q At 7555 Rivard, did you physically grab an adult by the arm and physically drag them?
>
> A No.

(*Id.* at 49.)

### 3. Procedural History

On June 15, 2015, Plaintiff brought this action against Defendant, in his individual capacity, and the City. (DE 1.) Count I of the Complaint is against

Zelenocks only and is for excessive force under the Fourth Amendment, under 42 U.S.C. §1983. (*Id.* at 4-6.)[7] Count II is also against only Zelenocks and is a §1983 claim for an unreasonable seizure without probable cause under the Fourth Amendment. (*Id.* at 6-7.) Count III is a §1983 claim against only the City. (*Id.* at 7-9.) Finally, Count IV contains various terse state law claims against Zelenocks, including gross negligence, willful and wanton misconduct, assault, battery, and intentional infliction of emotional distress. (*Id.* at 9-10.)

In April 2016, Defendants filed their joint motion for summary judgment. (DE 27.) After Plaintiff filed her response later that month (DE 29), Judge Rosen referred the motion to me for a Report and Recommendation. (DE 30.) Defendants filed their reply in May 2016. (DE 31.)

## B. Discussion

### 1. Standards of Review

---

[7] The Complaint also mentions the Fourteenth Amendment, but in her response to Defendants' motion for summary judgment Plaintiff states that she "has never contended that he [sic] maintains a Fourteenth Amendment claim. Its inclusion in his [sic] Complaint was merely in acknowledgment of the salutary relationship between the Fourth Amendment and Fourteenth Amendment whereby the former is rendered applicable to the states by the operation of the latter." (DE 29 at 11-12.) Moreover, Fourteenth Amendment excessive force claims are generally reserved for pretrial detainees. *See Hammond v. Lapeer County*, 133 F.Supp.3d 899, 914-915 (E.D. Mich. 2015) (discussing cases). Therefore, the Court should **GRANT** Defendants' motion for summary judgment to the extent Plaintiff has raised claims under the Fourteenth Amendment.

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is material if it might affect the outcome of the case under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 Fed. App'x 132, 135 (6th Cir. 2004) (internal citations omitted).

"The moving party has the initial burden of proving that no genuine issue of material fact exists . . . ." *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); cf. Fed. R. Civ. P. 56 (e)(2) (providing that if a party "fails to properly address another party's assertion of fact," then the court may "consider the fact undisputed for the purposes of the motion."). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The nonmoving party must "make an affirmative showing with proper evidence in order to defeat the motion." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009); *see also Metro. Gov't of Nashville and Davidson Cnty.*, 432 Fed. App'x 435, 441 (6th Cir.

11

2011) ("The nonmovant must, however, do more than simply show that there is some metaphysical doubt as to the material facts . . . .   [T]here must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute.") (internal quotation marks and citations omitted).  Summary judgment is appropriate when "a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case. . . ." *Stansberry*, 651 F.3d at 486 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

### 2.  Causes of Action

Plaintiff brings three enumerated claims against Zelenocks and one claim against the City.  The Court will address Plaintiff's claims against Officer Zelenocks before turning to the claim against the City.

### a.  §1983 Claims for Excessive Force and Unreasonable Seizure

Although he discusses qualified immunity in general, the main thrust of Defendant's motion is that Plaintiff's §1983[8] excessive force and unreasonable seizure claims must fail because no seizure of Plaintiff occurred.  I agree.

_____

[8] To establish a viable claim under §1983, a plaintiff must establish that he or she was deprived of a right "'secured by the Constitution and the laws of the United States' by one acting under color of law."  *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999) (quoting *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155-56 (1978)).

### i.   Qualified Immunity Standard of Review

The Court conducts a two-step analysis in assessing qualified immunity. First, the Court determines whether "the violation of a constitutional right has occurred" and second, whether the "constitutional right at issue was clearly established at the time of defendant's alleged misconduct." *Grawey v. Drury*, 567 F.3d 302, 309 (6th Cir. 2009) (quotation marks omitted). During the analysis, the Court must view the facts in the light most favorable to the plaintiff. *Id.* A defendant's subjective intent is "simply irrelevant" to a qualified immunity defense. *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998). The Sixth Circuit recently held that "[t]o deny qualified immunity, the court need not conclude that the inferences drawn by the Plaintiff are the only reasonable inferences that could be drawn, but must simply find that the inferences drawn are reasonable and not blatantly contradicted." *Harris v. Lasseigne*, 602 Fed. App'x 218, 222 (6th Cir. 2015).

### ii.   No Seizure Occurred

The main focus of Defendant's motion is his argument that Plaintiff was never subjected to a seizure. If no seizure occurred, Defendant argues, no constitutional violation could have occurred because "[a] seizure must occur before an excessive force claim is cognizable under the Fourth Amendment." *Dunigan v.*

---

There is no discernible dispute about whether Defendant was acting under color of state law.

*Noble*, 390 F.3d 486, 492 (6th Cir. 2004).[9]  Thus, the first question to be addressed

is whether Defendant seized Plaintiff.[10]  If the answer is no, then Defendant is

entitled to summary judgment because Plaintiff did not suffer a cognizable

violation of her constitutional rights.[11]

"A seizure within the meaning of the Fourth Amendment . . . requires an

intentional acquisition of physical control. [O]nly when there is a governmental

termination of freedom of movement through means intentionally applied is the

Fourth Amendment implicated."  *Dunigan*, 390 F.3d at 492 (emphasis, quotation

marks and citations omitted).  The Supreme Court has explained that "a person has

been 'seized' within the meaning of the Fourth Amendment only if, in view of all

---

[9] "Absent a seizure, an individual injured as a result of police misconduct may pursue a substantive due process claim."  *Id.* at n. 7.  However, Plaintiff's Complaint does not contain a substantive due process claim.

[10] Though Defendant testified in his deposition that he did not grab/drag anyone, the Court must assume that he did grab/drag Plaintiff because the facts must be construed in the light most favorable to her.  The Court must similarly presume Defendant used profanity towards Plaintiff, even though he denies doing so in his reply brief.  (DE 31 at 6.)  However, Defendant's usage of coarse or inappropriate language does not constitute excessive force.  *Johnson v. City of Ecorse*, 137 F.Supp.2d 886, 892 (E.D. Mich. 2001) ("Policemen's use of slurs and racial epithets is not a search or seizure, and thus cannot sink to the level of violating the Fourth Amendment's prohibition of excessive force.").

[11] As one court observed, "in excessive force cases, the qualified immunity and Fourth Amendment analyses often overlap and present a single question: [w]hether in the particular circumstances faced by the officer, a reasonable officer would believe that the force employed would be lawful."  *Piper v. City of Elmira*, 12 F.Supp.3d 577, 591 (W.D.N.Y. 2014) (quotation marks and citations omitted).

14

of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

Defendant was called to Rhiannon's home in response to domestic disturbance allegations, including assertions that people were yelling and physically fighting. *See* DE 31-5.[12]  When Defendant arrived, by Plaintiff's own account, Regina was outside and yelling.[13]  Plaintiff's curious description of the

---

[12] DE 31-5 is a dispatch log showing that officers were called due to "people yelling" and having been "physically fighthing [sic]."  (capitalization standardized).

[13] During Plaintiff's deposition, the following colloquy occurred:

> Q. All right. Was anyone yelling when the police arrived?
>
> A. Oh, Regina and that out there, she just wouldn't stop yelling. I don't even know what she was yelling.
>
> Q. So as you go outside and encounter a police officer on the grass, Regina is by her car and she's yelling?
>
> A. Yeah. Regina was yelling. She was by the car. I was on the grass. I was down here as the officer pulled up and got out. . . .
>
> Q. Okay. When you get by the door and see your husband, is Regina still yelling?
>
> A. Yeah, she was because he asked if we could go in the house and talk because he couldn't hear.

(Plaintiff's Dep. at 55-56.)

15

scene as "placid" when Defendant arrived in her response (DE 29 at 14) thus does not align with her own deposition testimony.

This Court has concluded that a police officer's strikingly similar conduct in comparable circumstances did not constitute a seizure. In *McKeown v. Harrison,* 2007 WL 1768767 (E.D. Mich. June 15, 2007), police were called to Plaintiff's home based on an excessive noise complaint. *Id.* at *1. Upon arrival, a police officer (later to become a Defendant) arrested someone he believed to be an intoxicated minor. *Id.* When the officer exited a trailer with the arrestee, "Plaintiff approached Defendant to inquire why he was on her property. Defendant physically moved Plaintiff out of the way and she fell to the ground. Plaintiff claim[ed] she suffered injuries from the fall." *Id.*

Judge Cox held no seizure occurred, reasoning as follows:

> There is no dispute in this case that Defendant had physical contact with Plaintiff and that the contact was deliberate. When describing his encounter with Plaintiff, Defendant testified:
>
> Q. Did you ever come in contact with, or make physical contact with [Plaintiff]?
>
> A. Yes.
>
> Q. And tell us what happened there?
>
> A. I had Mr. Linton in my left hand, she was between myself and my patrol car. **I grasped her forearm thumb up, and moved her to my left.**

16

Q. So you grasped her forearm and moved her to your left, is that what you described?

A. Yes sir.

Q. And what was the purpose of that?

A. **So that I can distance myself from the mob.**

[Response, Exhibit 2, pp. 42-43] (emphasis added). . . .

Plaintiff argues that Defendant's use of physical force to move her out of the way was sufficient to constitute a seizure. However, Plaintiff does not demonstrate how Defendant's contact with her would lead a reasonable person to believe she was not free to leave. Plaintiff does not allege that she was the subject of an investigation or that Defendant gave her any orders that restrained her movement. In fact, Plaintiff testified that Defendant pushed her merely to "get [her] out of the way." Plaintiff does not allege that she believed she was being detained in any way. According to Plaintiff, after Defendant pushed her, he left her there.

Although unpublished, the Sixth Circuit held in *Slocum v. Palinkas,* 50 Fed.Appx. 300 (6th Cir.2002), that an officer did not seize the plaintiff when he pushed him back during the arrest of the plaintiff's brother. The court pointed out that "[n]o effort was made to arrest or otherwise detain" the plaintiff. *Id.* at 302. Similarly, in *McCoy v. Harrison,* 341 F.3d 600 (7th Cir.2003), the court held that an animal control officer did not seize the plaintiff when he allegedly slapped her and dug his fingernails into her arm. In *McCoy,* the plaintiff testified that after the alleged altercation, the defendant let her go and walked away. *Id.* at 606. The court ruled that there was no evidence that the defendant intended to, or did, acquire physical control over the plaintiff; and there was no show of authority or restraint of her movement. Thus, the court determined there was no seizure for purposes of the Fourth Amendment.

Plaintiff relies on *Ciminillo* [*v. Streicher,* 434 F.3d 461, 464-465 (6th Cir.2006)] . . . to establish that she was seized. In *Ciminillo,* the plaintiff was in an area where a street party had escalated into a riot. The plaintiff tried to leave the area, but noticed officers randomly firing beanbag shots at the crowd. The plaintiff slowly walked

17

towards officers with his hands above his head. After allowing the plaintiff to advance about ten feet, the defendant shot the plaintiff with a beanbag in the chin and chest. The plaintiff fell to the ground and officers directed him to stay down; eventually he was told to report to another officer. However, the plaintiff was not arrested. The court ruled that there was a seizure. This case is distinguishable from *Ciminillo* because, in this case, the physical force was not accompanied by an effort to restrain or apprehend Plaintiff. In *Ciminillo,* the district court ruled there was no seizure because the use of force was not accompanied by an effort to restrain or apprehend the plaintiff. The Sixth Circuit disagreed, and ruled that there was an effort to restrain the plaintiff because the plaintiff was attempting to leave when he was shot; after being shot he was told to stay down; and the plaintiff was eventually directed to go to the end of the street and report to another officer.  In this case, there is no indication that Defendant made any such efforts to restrain Plaintiff.

> *When viewing all the circumstances surrounding this incident, there is no evidence that an objective person in Plaintiff's position would have believed she was restrained, i.e., she was not free to leave. Plaintiff did not even subjectively believe she was not free to leave based on her testimony. Defendant physically moved Plaintiff out of his way, but did not give any indication that she was not free to leave. Accordingly, Plaintiff was not seized for purposes of the Fourth Amendment.*

*Id.* at *2-3 (emphasis added and citations omitted).

As in *McKeown*, Defendant did not arrest Plaintiff or otherwise tell her she was not free to go after he moved her.  Indeed, Plaintiff stated that she went into the bathroom and closed the door after entering Rhiannon's house and thereafter had no contact with Defendant.  (Plaintiff Dep. at 30-31.)  Moreover the physical contact between the officer and Plaintiff in *McKeown* and the contact between Defendant and Plaintiff is strikingly similar:  an officer grabbed a bystander's arm and physically moved the bystander.

18

Plaintiff, surprisingly, does not attempt to distinguish—or even discuss--
*McKeown* in her response.  Plaintiff focuses instead on things like the ostensibly
benign intent underlying her choice to go outside to speak with Defendant.
However, subjective intent is irrelevant.  *Crawford-El*, 523 U.S. at 588.  Plaintiff
also accuses Defendant of escalating an otherwise "placid" scene.  (DE 29 at 15.)
However, as previously discussed, Plaintiff's own testimony does not depict a
placid scene.[14]  Moreover, Defendant could not have known immediately and
conclusively why Plaintiff came outside.

Defendant could arguably have taken a less aggressive approach, such as
verbally directing Plaintiff to go inside instead of making physical contact with
her.  However, the Supreme Court has cautioned courts to not engage in such
Monday morning quarterbacking, holding that:

> [t]he reasonableness of a particular use of force must be judged from
> the perspective of a reasonable officer on the scene, rather than with
> the 20/20 vision of hindsight. . . . With respect to a claim of excessive
> force, the same standard of reasonableness at the moment applies: Not
> every push or shove, even if it may later seem unnecessary in the
> peace of a judge's chambers, violates the Fourth Amendment.

---

[14] Plaintiff attempts to use Defendant's testimony to show the scene was calm upon
his arrival.  However, Defendant stated he could not recall whether there was
anyone outside when he arrived.  (Zelenocks Dep. at 26.)  In contrast to
Defendant's hazy recollection, Plaintiff conclusively testified that Regina was
outside and yelling before, during and after Defendant arrived and encountered
Plaintiff.  (Plaintiff's Dep. at 26, 55.)

*Graham v. Connor*, 490 U.S. 386, 396 (1989) (quotation marks and citations omitted).  More simply put, "[i]mplicit in the qualified immunity doctrine is a recognition that police officers, acting reasonably, may err."  *Dunigan*, 390 F.3d at 491.  At most, Defendant's grabbing Plaintiff's arm was a reasonable error insufficient to constitute a seizure.

In addition, Plaintiff has offered no evidence to rebut the opinion of Philip Abdoo, a use of force consultant, that Defendant acted reasonably under the circumstances.  (DE 27-8 at 3-4.)  Instead of countering Abdoo's opinion with another consultant's opinion or with specific citations to the record showing how/why Abdoo's opinion is incorrect, Plaintiff only generically asserts that Abdoo's opinion is "incredible as it is contradicted by the availing evidence."  (DE 29 at 13.)

Consistent with Judge Cox's holding in *McKeown*, the Court should conclude that Defendant did not seize Plaintiff.  The lack of a seizure is fatal to Plaintiff's excessive force and unreasonable seizure claims.  In other words, Defendant is entitled to qualified immunity because there was no violation of Plaintiff's constitutional rights to be free from either excessive force and/or an unreasonable seizure under the Fourth Amendment.  The Court should **GRANT** summary judgment to Defendant Zelenocks on each of Plaintiff's §1983 claims against him.

### b.  Plaintiff's State Law Tort Claims[15]

### i.      Gross Negligence/Willful and Wanton Conduct

### Gross Negligence

As Plaintiff's gross negligence claim arises from the same facts as her assault and battery claims, the gross negligence claim is not a viable freestanding cause of action.  *Bletz v. Gribble*, 641 F.3d 743, 756 (6th Cir. 2011) ("In Count I of her amended complaint, plaintiff claims that defendants' alleged use of excessive force constituted gross negligence, which is actionable under Mich. Comp. Laws § 691.1407. Although establishing that a governmental official's conduct amounted to 'gross negligence' is a prerequisite to avoiding that official's statutory governmental immunity, it is not an independent cause of action. The only cause of action available to plaintiff for allegations of this nature would be for assault and battery.").  *See also Norris v. Lincoln Park Police Officers*, 292 Mich.App. 574, 808 N.W.2d 578, 584 (Mich. Ct. App. 2011) ("A review of the amended complaint reveals that the claim of gross negligence is premised on the alleged assault of

---

[15] If the Court were to grant summary judgment on all of Plaintiff's federal causes of action, it could decline to exercise supplemental jurisdiction on Plaintiff's state law claims under 28 U.S.C. §1367(c)(3).  However, because discovery has closed, the Court could instead use its discretion to continue to exercise supplemental jurisdiction over the state law claims, as Judge Cox elected to do in *McKeown*, 2007 WL 1768767, at *5.  Even though this Report and Recommendation concludes that Defendant is entitled to summary judgment on Plaintiff's federal claims, in the interest of judicial economy the Undersigned will address Plaintiff's state law claims, lest these same claims ultimately end up being litigated anew before a state court judge.

21

plaintiff. Elements of intentional torts may not be transformed into gross negligence claims. Accordingly, the trial court erred by denying the motion for summary disposition of the gross negligence count for failure to state a claim.") (citation omitted).  Consequently, the Court should **GRANT** summary judgment to Defendant Zelenocks on Plaintiff's gross negligence claim.

## Willful and Wanton

Defendant asserts summary judgment is similarly appropriate on Plaintiff's willful and wanton conduct claim.  According to Defendant, willful and wanton conduct is "merely a necessary element to be proved in avoidance of an officer's common-law immunity to an intentional tort."  (DE 27 at 28.)

Plaintiff completely fails to address her willful/wanton misconduct claim in her response.  Therefore, she has abandoned that cause of action.  *See, e.g., Brown v. VHS of Michigan, Inc.*, 545 Fed. App'x 368, 372 (6th Cir. 2013) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.").  Moreover, Defendant's argument that willful/wanton misconduct is a factor to be considered in resolving a claim for immunity instead of an independent cause of action is well-taken.  *See Odom v. Wayne County*, 482 Mich. 459, 760 N.W.2d 217, 225 (Mich. 2008).  Consequently, the Court should

**GRANT** Defendant Zelenocks summary judgment on Plaintiff's willful/wanton misconduct claim.

### ii.    Immunity

Zelenocks contends he is immune under state law from Plaintiff's tort claims.  Generally, intentional torts are not protected by governmental immunity under Michigan law.  Governmental actions which would normally be considered intentional torts are protected by immunity, however, if those actions are justified. *Brewer v. Perrin*, 132 Mich. App. 520, 349 N.W.2d 198, 202 (Mich. Ct. App. 1984).  Governmental immunity is available only when an officer's conduct "does not amount to gross negligence that is the proximate cause of the injury." Mich. Comp. Laws § 691.1407(2)(c).   "Gross negligence" is defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results."  *Id.* at (8)(a).  A defendant's conduct is the proximate cause of the injury when it is "the one most immediate, efficient, and direct cause preceding an injury." *Grabow v. Cnty. Of Macomb*, 580 Fed. App'x 300, 312 (6th Cir. 2014) (quotation marks and citation omitted).

The Michigan Supreme Court provides the immunity requirements for the intentional torts of lower-ranking governmental employees as follows:

 (4) If the plaintiff pleaded an intentional tort, determine whether the defendant established that he is entitled to individual governmental immunity . . . by showing the following:

23

> (a) The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority,
> (b) the acts were undertaken in good faith, or were not undertaken with malice, and
> (c) the acts were discretionary, as opposed to ministerial.

*Odom*, 760 N.W. 2d at 228.[16]  "[B]oth the Sixth Circuit and this Court have recognized that '[t]he question of an officer's good faith under Michigan law overlaps considerably, if not entirely, with [the federal qualified immunity] analysis of whether the officer's actions were objectively reasonable under the circumstances.'"  *Chesney v. City of Jackson*, 171 F.Supp.3d 605, 632 (E.D. Mich. 2016) (quoting *Malory v. Whiting*, 489 Fed. App'x. 78, 86 (6th Cir. 2012) and citing *Cohn v. DeWeese*, 2010 WL 3906227, at *21-22 (E.D. Mich. Sept. 30, 2010)).[17]

Consistent with my qualified immunity analysis, I conclude that there is no evidence showing that Defendant acted maliciously or without good faith. Immediately after arriving at the scene of a domestic dispute, Defendant saw Plaintiff in the yard.  Nearby, Regina was yelling.  Faced with the necessarily split second decision of how to respond, Defendant briefly grabbed Plaintiff's arm and moved her towards the house, away from Regina.  Defendant ceased contact with

---

[16] The parties do not dispute that Defendant's acts were undertaken during the course of his employment and were discretionary in nature.

[17] Under Michigan law, Defendant has the burden to show that he acted without malice.  *Odom*, 760 N.W. 2d at 225.

24

Plaintiff once she was near the front door (i.e., was away from Regina).  Moreover, Defendant's actions were deemed reasonable by Philip Abdoo, whose opinion has not been contradicted by another consultant.  Taking these facts and circumstances into account, and consistent with the Court's qualified immunity conclusions, Defendant has immunity from Plaintiff's state law tort claims, meaning that he should be **GRANTED** summary judgment on those claims.  Nonetheless, the Court will briefly examine those tort claims.

### iii.   Assault and Battery

To establish an assault claim, a plaintiff must show an "intentional unlawful offer of corporal injury to another person by force, or force unlawfully directed toward the person of another, under circumstances which create a well-founded apprehension of imminent contact, coupled with apparent present ability to accomplish the contact." *Espinoza v. Thomas*, 189 Mich. App. 110, 472 N.W.2d 16, 21 (Mich. Ct. App. 1991).  To establish a claim for battery, a plaintiff must show "willful and harmful or offensive touching of another person which results from an act intended to cause such contact." *Id*.

As previously discussed, the record does not support a conclusion that Defendant's brief usage of force against Plaintiff was unlawful and/or intentionally willful, harmful and inconsistent with his good faith duties as a police officer.  In addition, Abdoo's opinion that the usage of force against Plaintiff was reasonable

25

and proper is unrebutted.  Thus, Defendant should be **GRANTED** summary judgment on Plaintiff's assault and battery claims.

### iv.     Intentional Infliction of Emotional Distress

To establish a claim of intentional infliction of emotional distress ("IIED"), a Plaintiff must show "(1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress." *Haverbush v. Powelson,* 217 Mich.App. 228, 551 N.W.2d 206, 209 (Mich. Ct. App. 1996).[18]  To be legally actionable, the emotional distress must be "so severe that no reasonable man could be expected to endure it." *Haverbush*, 551 N.W. 2d at 209 (quoting Restatement 2d Torts § 46).

Conduct is considered "extreme and outrageous" only if it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.*  "Liability will not be found for mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities; rather, the case must be one in which the facts would arouse the resentment of an average member of the community against the actor, leading him to exclaim, 'Outrageous!'" *Garretson v.*

---

[18] Though the Michigan Supreme Court has yet to rule definitively on it, the Michigan Court of Appeals has long recognized IIED as a viable tort.  *See, e.g., Rosenberg v. Rosenberg Bros. Special Account*, 134 Mich. App. 342, 351 N.W.2d 563, 567 (Mich. Ct. App. 1984).

*City of Madison Heights*, 407 F.3d 789, 799 (6th Cir. 2005) (quotation marks and citation omitted).

Even viewed in the light most favorable to Plaintiff, Defendant's actions are not sufficiently intolerable or outrageous.  Both this Court and Michigan state courts have held that similar or even more egregious conduct was insufficient to present a viable IIED claim. For example, in a case where officers were called to the scene of an alleged instance of domestic violence, were denied entry but nonetheless forced their way into the apartment (despite not having a warrant), struck one plaintiff in the side with their knees at least twice and then stunned that plaintiff multiple times with tasers, this Court held that the officers were entitled to summary judgment on the IIED claim—even though the officers were not entitled to summary judgment on excessive force/assault and battery claims stemming from the same conduct.  *Wright v. Bloomfield Tp.*, 2014 WL 5499278, at *21 (E.D. Mich. Oct. 30, 2014) (Rosen, C.J.).

Specifically, this Court held in *Wright*:

> Viewing the evidence in a light most favorable to Plaintiffs, the Court cannot say that a reasonable trier of fact could characterize the conduct of the Defendant officers in this case as extreme, outrageous, or utterly intolerable. Although the record, viewed in Plaintiffs' favor, establishes that Officers Kollman and Weise forced their way into Plaintiffs' apartment rather than seeking a less confrontational means to ascertain whether anyone in the home was injured or in need of medical attention, there is no evidence that the officers used an extreme degree of force or were unusually destructive in carrying out this warrantless entry. Likewise, while the record would support a

27

finding that Officers Kollman and Weise employed excessive force against Mr. Wright upon entering his apartment, the officers' knee strikes and taser stuns were relatively few in number and limited to the purpose of getting Mr. Wright down to the floor with his hands behind his back, and he declined their offer of medical attention after he had been subdued and placed in handcuffs. More generally, Plaintiffs fail to cite any evidence of permanent property damage to their apartment, nor was any force used or injury inflicted on any occupant of the home other than Mr. Wright. Under this record, the Court finds that Defendants are entitled to an award of summary judgment in their favor on Plaintiffs' claim of intentional infliction of emotional distress.

*Id.* at *21 (footnote omitted).

Similarly, Michigan state courts have frequently deemed quite egregious conduct to not constitute a viable IIED claim. For example, in *Warren v. June's Mobile Home Village & Sales, Inc.*, a Defendant landlord was alleged to have repeatedly called, screamed at and berated his tenants, including one episode in which he got them out of bed on a Sunday morning and screamed at them, in addition to going to their neighbors and telling them that Plaintiff was a troublemaker and a "bitch." He also refused to let the prospective buyer of Plaintiff's mobile home be a tenant on Defendant's mobile home site, thereby scuttling the sale, and told one of the plaintiffs that, because of a dispute over the electric bill, their mobile home itself could not remain on Defendant's property, which eventually caused them to have to abandon their mobile home because improvements thereto made it immovable. 239 N.W.2d 380, 382-383 (Mich. Ct. App. 1976). *See also, e.g., Meek v. Michigan Bell Tel. Co.*, 483 N.W.2d 407, 410

(Mich. Ct. App. 1991) ("Plaintiffs' deposition alleged that defendant Schulz told plaintiff to put her purse away, to wear pants with pockets so she could keep a wallet in them like men do, and to wear shoes like the other guys. Defendant Schulz also called defendant chubbly, a combination of chubby and ugly, in front of the crew and described a ring given to her by her husband as a Jewish-American princess ring. In addition, employees under defendant Schulz' supervision called plaintiff a Jewish-American princess and asked plaintiff who she had slept with to get her job. Accepting these factual allegations as true, we hold that the trial court did not err in concluding that these allegations clearly do not rise to the level of extreme and outrageous conduct to support a claim of intentional infliction of emotional distress."); *Clarke v. K Mart Corp.*, 495 N.W.2d 820 (Mich. Ct. App. 1992) (holding that African-American Plaintiff had not presented a viable IIED claim based on her having been detained at a store and having had her bags snatched away and searched solely because a supervisor incorrectly thought an African-American cashier had not charged the Plaintiff for a purchase).

In addition, Plaintiff discusses her physical injuries in her response but she does not discuss any severe emotional distress she purportedly suffered. Taking the facts and relevant precedent into account, the Undersigned therefore recommends that the Court **GRANT** summary judgment to Defendant Zelenocks on Plaintiff's IIED claim.

### c.  The §1983 Claim Against the City

Plaintiff contends the City engaged in a custom, pattern, and/or practice of failing to safeguard against unconstitutional conduct, tolerating unconstitutional conduct, failing to take proper investigations of misconduct and/or disciplinary action, and failing to supervise and/or train officers who engaged in unconstitutional conduct.  The City counters that Plaintiff fails to provide competent evidence to support her assertions.  Specifically, according to the City, Plaintiff cites to no specific policies or training failures and instead supports her allegations on the basis of a single incident – her own.  She instead limits her response to a brief recitation of some law about *Monell* claims, and then concludes that the City "was deliberately indifferent to the Plaintiff's rights, as there was no justification for Defendant Zelenocks to have been so brazenly athwart [sic] her Fourth Amendment rights[,]" without any record citation in support.  (DE 29 at 20.)

A governmental entity is responsible under §1983 "when the execution of [its] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury. . . ." *Monell v. Dep't Servs. of City of New York*, 436 U.S. 658, 694 (1978).  A local government is not liable under §1983, however, "for an injury inflicted solely by its employees or agents." *Id.*  Inadequacy of police training may subject a local government to

30

liability under §1983 "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989).  To prevail on a failure to train claim, Plaintiff must show "'prior instances of unconstitutional conduct demonstrating that the [municipality] ha[d] ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'" *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (quoting *Miller v. Sanilac Cnty.*, 606 F.3d 240, 255 (6th Cir. 2010)).  "Similarly, a custom-of-tolerance claim requires a showing that there was a pattern of inadequately investigating similar claims." *Burgess*, 735 F.3d at 478.

Plaintiff has not set forth any facts to show prior instances of similar unconstitutional conduct.  Although she alleges a custom, pattern, or practice, she discusses only her own interaction with Defendant.  A single incident is insufficient is establish *Monell* liability under §1983.  *See, e.g., City of Oklahoma v. Tuttle*, 471 U.S. 808, 824 (1985) ("where the policy relied upon is not itself unconstitutional, considerably more proof than a single incident will be necessary in every case to establish both the requisite fault on the part of the municipality and the causal connection between the 'policy' and the constitutional deprivation."); *Jordan v. City of Detroit*, 557 Fed. App'x 450, 457 (6th Cir. 2014) ("A single instance, without more, does not amount to a custom, policy or practice.").

31

Plaintiff cannot rely solely upon the incidents alleged in her Complaint as evidence of the City's liability under §1983, nor is she able to point to prior instances of unconstitutional conduct demonstrating that the City ignored a history of abuse or was otherwise on notice that its police officer training was deficient. Indeed, she was unable to name any City policies or procedures which underlie her Complaint at her deposition and points to no helpful admissions or documents acquired from the Defendants through discovery. Accordingly, the Undersigned recommends that the Court **GRANT** the City summary judgment on Plaintiff's §1983 claim against it.

## III.   CONCLUSION

For the foregoing reasons, the Undersigned recommends that the Court **GRANT** Defendants' Motion for Summary Judgment in its entirety. (DE 27.)

## IV.   PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a

party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.*  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.*  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated: December 8, 2016          s/Anthony P. Patti
                                 Anthony P. Patti
                                 UNITED STATES MAGISTRATE JUDGE

I hereby certify that a copy of the foregoing document was sent to parties of record on December 8, 2016, electronically and/or by U.S. Mail.

                                 s/Michael Williams
                                 Case Manager for the
                                 Magistrate Judge Anthony P. Patti

33